

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 2:08-CR-080 |
| | § | |
| RAMON BANUELOS-ROMERO | § | |

# REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS

Came for consideration the motion to suppress filed January 8, 2009 by defendant RAMON BANUELOS-ROMERO. On January 21-22, 2009, an evidentiary hearing on the defendant's motion was held. Upon consideration of the evidence presented at the hearing, the pleadings, and controlling case law, the undersigned United States Magistrate Judge is of the opinion defendant's motion to suppress should be DENIED. Although the Court finds the government failed to meet its burden to prove the defendant voluntarily gave his consent to search the vehicle, the Court further finds there was probable cause to search the vehicle without the defendant's consent.

## I.
## FACTUAL BACKGROUND

The following is a summary of the evidence presented at the hearing on the suppression motion. It is edited for the purposes of this Report and Recommendation and is not a verbatim recitation of all the testimony elicited during the hearing. A record of the exact testimony given during the hearing requires a transcript of the hearing be prepared.

On November 11, 2008, at approximately 10:20 a.m., Department of Public Safety (DPS)

Trooper Ben Dollar was patrolling on I-40 when he observed the defendant's 2004 Mercury Marquis traveling at fifty-eight miles per hour in a seventy-mile-per-hour zone and crossing the fog line or right roadway boundary onto the roadway's improved shoulder. The trooper effected a traffic stop of defendant's vehicle for the offense of driving on an improved shoulder and to investigate whether the driver might be impaired in some manner, i.e., intoxicated or fatigued. Defendant, RAMON BANUELOS-ROMERO, was driving the car, and there was one female passenger.

Upon approaching the vehicle on the passenger side, Trooper Dollar explained the reason for the stop and asked, "You okay? You['re] not falling asleep or anything are you?" (DPS Video Transcription, Defendant's Exhibit 2 (hereinafter DPS Transcript), pg. 2). The defendant answered, "No," and the trooper asked for his license and insurance. (*Id.*) The defendant immediately complied.

### A. Indicators of Criminal Activity Exhibited by the Car

As Trooper Dollar was waiting for the defendant to gather the documents, he stepped back from the window and leaned (placing his hand or palm) against the windshield.[1] He had noticed the very strong odor of silicone emitting from inside the vehicle upon his initial approach, and when he leaned against the windshield, he unwittingly got fresh silicone on his hand. At that point, the trooper examined the car more closely. He noticed the windshield had been recently replaced and that silicone was all over the sides of the windshield. According to his testimony, the trooper did not "lift[] and peel[] back the rubber strip covering the windshield edge to inspect the silicone sealant for 'freshness,'" but rather could determine from looking at the windshield, feeling the tackiness of the silicone oozing out from underneath the weatherstripping, and smelling the strong

---

[1] Trooper Dollar testified he did this for safety reasons—to establish a point of reference from which he could simultaneously observe oncoming traffic and the vehicle's occupants.

silicone odor that the sealant was fresh. (*See* Defendant's Brief in Support of Motion to Suppress, pg. 3). Trooper Dollar also observed scarring on the screws used to hold down the plastic piece between the hood and windshield, a piece which must be removed to replace the windshield.

The trooper additionally noticed the car had Ford emblems on the outside (in fact, the trooper originally thought the car was a Ford Crown Victoria). But a closer look at the car revealed, despite its outside Ford markings, the car had a Mercury steering wheel and tire rims; the trooper later saw a Mercury outline where the emblems had once been on the outside, and all the computer checks identified the car as a Mercury. Trooper Dollar thought it strange defendant was attempting to make the car, a Mercury, look like a Ford. The trooper testified he recalled, from his experience and DPS training,[2] the Mercury Marquis is a popular choice for drug trafficking because it contains a compartment or dead space in the firewall area—between the dashboard and the engine—in which contraband can be secreted. Trooper Dollar stated access to the compartment can be gained only by removing the windshield or cutting through the dashboard. Before the final clearance on the criminal history check and the car check came back, Trooper Dollar observed multiple cell phones, open food and drink containers, window cleaner, and a rabbit's foot in the car, all of which indicated to him, based upon his training and experience, that criminal activity, i.e., trafficking something illegal, was afoot.

### B. Indicators of Criminal Activity Exhibited by the People in the Car

After the defendant handed the trooper the documents he had requested, Trooper Dollar told the defendant to wait in the passenger seat of the patrol car and that he would momentarily be with him. While the defendant was in the patrol car, Trooper Dollar attempted to speak with the female

---

[2] Trooper Dollar testified he was trained for in drug interdiction and has been teaching drug interdiction for the DPS for the past two-and-a-half years.

passenger, who spoke very little English. As he was trying to speak with her in Spanish, the trooper noticed she was nervously and obsessively sipping coffee from a cup, stating she would not bring the cup away from her mouth. After approximately one minute of attempted conversation, Trooper Dollar contacted, on his cell phone, a fellow trooper who was fluent in Spanish. The trooper he contacted was Trooper Oscar Esqueda.

When he contacted Trooper Esqueda, Trooper Dollar explained the situation, stating he thought he was going to have a "windshield load" but that he was having difficulty communicating with the passenger. He said, "If you just talk to her. Where uh where I can just knock it down." Trooper Dollar explained that, at this point, based upon all of the indicators he had observed, he suspected he had encountered drug traffickers and wanted to see if the stories from the defendant and the passenger would match.

As Trooper Esqueda was speaking with the passenger, Trooper Dollar noticed she had abandoned her coffee cup and was, by then, "nervously" eating an apple. The trooper found it significant she ate an entire side to the core during the course of her two-minute conversation with Trooper Esqueda. He also observed a protruding vein in her neck and the pulse going through it, which he considered, based upon his training, to be a result of increased adrenaline and heightened heart rate. On cross, Trooper Dollar admitted he does not have training to visually take a pulse and could not detail the passenger's heart rate so as to compare it to the average heart rate. He stated, however, that the passenger was also breathing rapidly.

The passenger told Trooper Esqueda she and her boyfriend, the defendant, were coming from California going to Arkansas. She appeared, to Trooper Esqueda, to not know her boyfriend's last name, but said they were going to look for an apartment in Arkansas and that she was going to look

for a job. She stated she had lost her job at a boot store in California and was going to Arkansas to apply for jobs. The passenger said she and the defendant had been in Arkansas the week prior, but the defendant left her there and she had to fly back to California. Given these statements, Trooper Esqueda stated he thought it strange for someone to travel such a great distance to simply apply for a job, especially considering the fact they had been there the week prior. While she was speaking with him, Trooper Esqueda could tell (from her voice) that the passenger was nervous and had difficulty answering simple questions. The trooper testified the passenger would either say, "um," or "mande,"[3] or would repeat the trooper's questions, indicating to him she was stalling for time to think of the answer. On cross, the trooper admitted the passenger was speaking to him from a car on the shoulder of the road and that passing traffic may have made it difficult for her to hear.

Trooper Dollar then returned to the patrol car and let the defendant speak with Trooper Esqueda. The defendant told Trooper Esqueda he was traveling from San Diego County to Batesville, Arkansas with his girlfriend. The defendant said the purpose of the trip was so his girlfriend, the passenger, could look for a job and that he could not work because of a back injury. Contrary to what the passenger had said about looking for an apartment, the defendant said they already had an apartment in Arkansas. The defendant's driver's license was from California.

The defendant told Trooper Esqueda he and his girlfriend had already been in Arkansas and the reason he went back to California was "just because." The defendant then told Trooper Esqueda he had bought the car approximately a week and a half prior from a person off the street in Arkansas named Omar Carlon. The trooper thought this odd because both the passenger and defendant had told him they were unemployed. While the defendant was cooperative, both troopers noticed signs

---

[3] Trooper Esqueda testified this word, "mande," is the equivalent to "what" in the English language.

of nervousness he was exhibiting. The trooper stated the defendant frequently said, "uh," in response to simple questions, as if he had to think of the answer, and Trooper Dollar noticed the defendant's hand was badly shaking as he held the cell phone to his face.

At this point, Trooper Esqueda conferred with Trooper Dollar and told Trooper Dollar the inconsistency about the apartment and the seemingly unlikely purpose of the trip. Trooper Esqueda testified he thought, even though there were several similarities in the two stories, that the totality of the circumstances indicated the two were hiding some kind of criminal activity.

### C. Consent to Search

While conferring with Trooper Esqueda, Trooper Dollar indicated he was going to have the passenger drive the car to another location so the windshield could be removed. After he ended the conversation with Trooper Esqueda, Trooper Dollar issued the defendant, who was still sitting in the patrol car, a warning and returned his driver's license and other documents to him. The trooper reiterated several times the defendant was only receiving a warning. Trooper Dollar then asked a series of questions regarding whether the defendant was transporting any weapons or drugs. He asked the defendant, "tiene clavos aqui," which Trooper Dollar understood to mean "do you have any compartments here." (DPS Transcript pg. 10). When the defendant said, "perdon," the trooper said, "clavos, compart, compare, compartamentos." Trooper Esqueda testified "clavos" literally means "nail" but is colloquially used for "compartment." The trooper additionally testified "clavos" is used as "compartment" in narco-trafficking music, which was later discovered in the car. The defendant responded, "no no se que clavos," which means "no, no don't know what nails/compartments," depending on the translation.

At that point, Trooper Dollar said, "Okay. Puedo registrar el car si or no." (*Id.* pg. 11). The defendant said, "Yeah," and Trooper Dollar again asked, "Si si o no," and the defendant said "Si."

(*Id.* pg. 10). There was a substantial amount of testimony regarding the meaning of the pivotal word "registrar" in the trooper's question. The trooper testified he meant to ask, "Can I search the car, yes or no." He said he was taught "registrar" meant "to search" and he had successfully communicated "to search" by using the word "registrar" on more than fifty occasions. Trooper Esqueda, who is fluent in Spanish and certified with DPS as bilingual, testified "registrar" is commonly used for "search" and that when he asks if he can search a vehicle, he uses "registrar." Furthermore, when DPS troopers, who must take Spanish classes, are trained, they are told to use "registrar" when asking to search a vehicle. Trooper Esqueda testified other words in the Spanish language could be used to represent "search," but "registrar" is the most common word. The trooper admitted "registrar" can also mean "to register."

The defendant testified and stated he thought the trooper meant, "Can I register the car," when he said, "puedo registrar el car." The defendant's testimony was consistent that he thought he was consenting to the officer using his computer to search or verify the car's registration to make sure it was not stolen and that he (the defendant) did not realize the trooper was asking to physically search the vehicle. The defendant said if the trooper wanted permission to physically search the vehicle, he would have used "revisar," not "registrar." When asked why he did not stop Trooper Dollar as soon as he realized the trooper intended to physically search the vehicle, the defendant stated he was unaware of the law and did not understand he could tell the trooper to stop.

Trooper Dollar raised and looked under the hood and in the trunk and looked through the car at the roadside. The parties have not indicated, and the Court has failed to find, any significant additional evidence which was uncovered by the trooper during this roadside search. At that point, Trooper Dollar asked the passenger to follow him to a DPS location where they could remove the windshield. Once the windshield was removed, the trooper discovered a large quantity of crystal

methamphetamine hidden inside the space between the car's firewall and engine.

II.
THE TRAFFIC STOP

A routine traffic stop is analyzed under the guidelines set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, the court must determine the reasonableness of the search or seizure by asking (1) whether the officer's action was justified at its inception and (2) whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878.

When considering the facts and circumstance of a stop, the court must "give[] due regard to the experience and training of the law enforcement officers" and "allow law enforcement 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *U.S. v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc) (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750-51, 151 L. Ed. 2d 740 (2002)). Any evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981).

*A. Inception of the Stop*

Under Texas law, "An operator may drive on an improved shoulder to the right of the main traveled portion of a roadway if that operation is necessary and may be done safely, but only:

(1) to stop, stand, or park;

(2) to accelerate before entering the main traveled lane of traffic;

(3) to decelerate before making a right turn;

(4) to pass another vehicle that is slowing or stopped on the main traveled portion of the highway, disabled, or preparing to make a left turn;

(5) to allow another vehicle traveling faster to pass;

(6) as permitted or required by an official traffic-control device; or

(7) to avoid a collision.

7 TEX. ADMIN. CODE § 545.058 (1999). As established by the Supreme Court in *Whren v. U.S.*, the temporary detention of a motorist who the police have probable cause to believe has committed a traffic violation is reasonable under the Fourth Amendment. 517 U.S. 806, 819, 116 S. Ct. 1769, 1777, 135 L. Ed. 2d 89 (1996). Defendant argues Texas case law holds the mere crossing of a fog line does not provide probable cause or even reasonable suspicion to initiate a traffic stop. *See Fowler v. State*, 266 S.W.3d 498, 504 (Tex. App.—Fort Worth 2008, pet. struck) (holding an officer lacked reasonable suspicion when he saw a car cross the fog line by no more than a tire's width one time when there was no nearby traffic); *State v. Huddleson*, 164 S.W.3d 711, 713-14 (Tex. App.—Austin 2005, no pet.) (holding an officer lacked reasonable suspicion when he saw a car slowly drift over the fog line five times over five to six miles while traveling under the speed limit); *Corbin v. State*, 33 S.W.3d 90, 94 (Tex. App.—Texarkana 2000), rev'd on other grounds, 85 S.W.3d 272 (Tex. Crim. App. 2002) (holding an officer lacked reasonable suspicion when he saw a car traveling thirteen miles per hour under the speed limit and crossing the fog line once); *State v. Tarvan*, 972 S.W.2d 910, 911 (Tex. App.—Waco 1998, pet. ref'd) (holding an officer lacked reasonable suspicion when he saw a car drift over the fog line two to three times at 2:00 in the morning near a nightclub). The law, however, is far from definitive. *See Tyler v. State*, 161 S.W.3d 745, 750 (Tex. App.—Fort Worth 2005, no pet.) (holding a driver crossing the fog line for no apparent reason provided probable cause for the officer to initiate a traffic stop); *Cook v. State*, 63 S.W.3d 924, 928-29 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (holding traffic law was violated by the driver's constant crossing of the white line). Furthermore, Texas law specifically recognizes, "there is no requirement that a particular statute is violated in order to give rise to reasonable suspicion" if the officer notices activity indicating driver impairment. *Gajewski v. State*, 944 S.W.2d 450, 452 (Tex. App.—Houston [14th Dist.] 1997, no pet.).

Despite testimony from a former police officer that he could not see an oncoming vehicle cross the fog line at the disputed area, Trooper Dollar testified under oath that he saw this traffic violation occurring. He stated, as he was traveling west, he passed the defendant's car, going east, and observed the passenger-side tires of defendant's vehicle cross over the fog line. On that stretch of roadway, the trooper explained, there are rumble strips located directly on the other side of the fog line, so that if one were to fall asleep and cross the line, the noise made by hitting the rumble strips would alert the driver he or she is drifting off the roadway. The trooper testified that, during the short period of time when he observed the defendant's vehicle, he saw the car's passenger-side tires cross the fog line, pass over the rumble strips, and continue off the roadway until about half of the car was traveling on the shoulder. At that point, the trooper turned around and pursued the car until he caught up to it, activating his emergency lights.

Trooper Dollar cited section 545.058 of the Texas traffic code as justification for stopping the defendant's car. The trooper stated the car violated this law and none of the exceptions listed in the section were applicable at the time. Trooper Dollar testified driving on the shoulder is considered a hazardous violation and is frequently an indicator of a dangerous situation, and he, personally, had seen several serious car wrecks initiated by the driver crossing the fog line. More importantly, he spoke of his awareness of sleep deprivation in the morning along a long stretch of rural roadway and of the danger of an intoxicated driver. Based on these observations and his training and experience, Trooper Dollar testified he was concerned the driver was impaired because the tires crossed too far over the fog line and for too long a period of time for the driver to simply be momentarily inattentive, especially considering the car's traveling speed, which was more than ten miles-per-hour below the posted speed limit.

Furthermore, the Texas case law outlined previously and holding the officer should not have initiated a traffic stop all involved section 545.060 of the Texas Transportation Code, which discusses failure to maintain a single marked lane. In this case, Trooper Dollar testified he stopped the defendant based on his observation of violation of section 545.058 of the Texas Transportation

Code, which allows driving on an improved shoulder only in specified circumstances, i.e., only if the action (1) is necessary, (2) can be safely done, and (3) falls within any of the listed exceptions. Noting defendant did not meet any requirements when he drove on the improved shoulder, Trooper Dollar initiated a traffic stop, for what he had observed—a clear violation of Texas law. *See Tyler*, 161 S.W.3d at 750 (holding a driver crossing the fog line without meeting the requirements of section 545.058 of the Texas Transportation Code provided probable cause for the officer to initiate a traffic stop). Trooper Dollar had reasonable suspicion the defendant had committed a traffic violation. *See United States v. Shabazz*, 993 F.2d 431 (5th Cir. 1993); 7 TEX. ADMIN. CODE § 545.058.

Alternatively, even if Trooper Dollar did not have reasonable suspicion to stop the defendant based upon a violation of state law, he had sufficient reasonable, articulable suspicion the driver might be impaired. *See United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003) (holding an officer had reasonable suspicion to stop a vehicle when he observed a vehicle traveling sixteen miles-per-hour under the speed limit and traveling partially on the shoulder); *United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999) (holding an officer had reasonable suspicion to stop a vehicle and check for driver impairment when it drifted onto the shoulder twice for no apparent reason). The trooper in this case saw the car unexplainably cross the fog line and the rumble strips until more than half of it was traveling on the improved shoulder. Based on his training and experience, the trooper was aware of the danger of sleep deprivation along a rural stretch of roadway and of the possibility of an intoxicated driver and was concerned for the driver's safety. He therefore did not violate the Fourth Amendment when he stopped the defendant's car. *See Cortez*, 449 U.S. at 418, 101 S. Ct. at 695; *Sanchez-Pena*, 336 F. 3d at 437.

### B. *Continuation of the Stop*

The next question is whether Trooper Dollar's actions of continuing the detention after the final clearance of the vehicle and passenger information was reasonably related in scope to the

circumstances which justified the interference in the first place. *See Terry*, 392 U.S. at 19, 88 S.Ct. at 1878.

A detention may last no longer than required to effect the purpose of the stop. *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir.2005) (quoting *U.S. v. Brigham*, 382 F.3d at 507). If all computer checks come back clear, then as a general matter reasonable suspicion disappears and there is no legitimate reason for extending the stop. *See id*. at 431. "A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id*. Importantly, as the *Brigham* court established: "There is . . . no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. 382 F. 3d at 511 (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985)).

During the initial approach of the car, Trooper Dollar observed the strong odor of silicone. Upon casually placing his hand on the windshield, he noticed fresh silicone sticking to his hand and that the entire windshield appeared to have fresh silicone all around it. He also noticed the scarring on the screws holding down a piece of the car's trim, which must be removed for the windshield to be taken out and noticed the attempts to hide the car's identity as a Mercury Marquis. He observed other signs, which were significant to him, as indicators the two were engaged in trafficking something illegal, *i.e.* multiple cell phones,[4] open food and drink containers, window cleaner, and a rabbit's foot. Furthermore, both the defendant and passenger were acting extremely nervously, breathing rapidly, and having difficulty answering basic questions about their trip. The trooper

---

[4]The Court is unaware of any testimony indicating whether there was one cell phone for each of the car's occupants or more than one per occupant, however it notes Trooper Dollar can be seen in the DPS video of the traffic stop putting two cell phones on the hood of the patrol car after searching the defendant's car.

considered their answers to be inconsistent and therefore suspect. They were traveling in a vehicle that was in a third-party's name and that they had allegedly bought from someone off the street in Arkansas at a time when both were unemployed.

Although these factors may not be illegal by themselves and standing alone, each of these factors, when considered in total, indicated to Trooper Dollar some form of illegal trafficking was afoot. He knew from his training the make of the car was one commonly used in drug trafficking and from his own observations someone was trying to disguise the car. The windshield had been recently replaced. All of the additional indicators of criminal activity came to the trooper's attention before the final clearances on the car and defendant's information came back. Looking at the totality of the circumstances, and giving due deference to Trooper Dollar's specialized drug interdiction training, as we must, the trooper's continued detention of the defendant did not violate the Fourth Amendment. *See Cortez*, 449 U.S. at 418, 101 S. Ct. at 695. These interrelated factors, along with Trooper Dollar's training for drug interdiction, provided reasonable suspicion defendant was engaged in trafficking something illegal.

*C. Consent*

As discussed above, under the strictures of *Terry*, the officer's actions in continuing to detain a driver must be reasonably related in scope to the circumstances which justified the interference in the first place. The officer may ask questions related to the stop, "but any further detention or search must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 95 S. Ct. 2574, 2580, 45 L. Ed. 2d 607 (1975). "The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993).

To be valid, consent to search must be knowingly and voluntary given, free from any

coercion, as evaluated under the totality of the circumstances. *Kelley*, 981 F.2d at 1470; *United States v. Tedford*, 875 F.2d 446, 451 (5th Cir. 1989). The Fifth Circuit has outlined six primary factors for courts to consider in determining whether a consent to search was valid:

1. the voluntariness of the defendant's custodial status;

2. the presence of coercive police procedures;

3. the extent and level of the defendant's cooperation with the police;

4. the defendant's awareness of his right to refuse to consent;

5. the defendant's education and intelligence; and

6. the defendant's belief that no incriminating evidence will be found.

*Kelley*, 981 F.2d at 1470.

In this case, there is a critical dispute as to whether the defendant gave valid consent for the DPS trooper to search his vehicle. Based on the translation of "registrar," which was the word Trooper Dollar used for "search," the issue is whether the defendant knowingly agreed to allow a search of the vehicle. At the time Trooper Dollar asked for permission to search the car, the defendant was still located in the patrol car, and the trooper had, immediately prior to questioning him and asking for consent, returned all of the defendant's documents.

There is no evidence indicating coercive police tactics. Both troopers indicated the defendant was extremely cooperative with them throughout the stop. The defendant, however, testified he did not know the laws of this country and did not know he could tell the trooper to not search his vehicle. The defendant also testified he had formal education through the fourth grade in Mexico. There was no evidence on the question of whether the defendant thought the search would reveal incriminating evidence.

There is nothing to indicate the defendant's testimony was not credible. While he did not

volunteer information and while he was careful with his answers, there was nothing to indicate he was providing false testimony.[5] In fact, he admitted he was paid $5,000 to take the car from California to Arkansas. It is also clear the defendant was not advised of his right to refuse consent. Without evidence that the defendant knew of his right to refuse, the argument the defendant did not stop the trooper when he began physically searching the vehicle is not persuasive.

While the testimony concerning normal DPS practice of the use of "registrar" and general meaning of the word is also credible, the issue with respect to this defendant, given his education, background, his testimony and the testimony of Rosemary Hernandez, a certified English-Spanish translator who testified "registrar" means "register" and "revisar" means "search," the government has failed to meet its burden of establishing the validity of the consent. Had the defendant not testified, the Court very well might have found that the government met its burden of proof based on the testimony concerning the normal DPS practice and the common understanding of the word. However, the defendant's testimony sufficiently calls into question the validity of his consent. It is a close question, but the undersigned finds the government has failed to show by a preponderance of the evidence the defendant knowingly gave consent for the automobile search.

### D. Probable Cause to Search

Police may search an automobile, regardless of the driver's consent, if they "have probable cause to believe it contains evidence of a crime." *Colorado v. Bannister*, 449 U.S. 1, 3, 101 S. Ct. 42, 43, 66 L. Ed. 2d 1 (1991). Additionally, "when federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband." *Florida v. White*, 526 U.S. 559,

---

[5] The only basis for considering defendant's testimony suspect is the general concern that someone accused of criminal activity may lie to protect themselves from being found guilty.

563, 119 S. Ct. 1555, 1558, 143 L. Ed. 2d 748 (1999).  If police develop probable cause at the side of the road to search an automobile, that probable cause remains in effect at the police station house, and the police need not obtain a warrant prior to searching the vehicle.  *Texas v. White*, 423 U.S. 67, 67, 96 S. Ct. 304, 305, 46 L. Ed. 2d 209 (1975); *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S. Ct. 1975, 1982, 26 L. Ed. 2d 419 (1970).

The facts of this traffic stop, when considering them in the totality of the circumstances, and further considering Trooper Dollar's interpretation of them based on his experience and training, provided probable cause to search the vehicle even before Trooper Dollar asked for consent from the defendant.  He had indicators of criminal activity exhibited by the car.  (*See* Section I.A., *supra*).  The occupants of the car were excessively nervous and gave stories that, while not entirely inconsistent, were not perfectly matched, even in the simple details.  (*See* Section I.B., *supra*).  They were traveling in a newly purchased vehicle not registered in the defendant's name.  As the trooper testified, safety issues prevented a road-side search, as the only way to properly search the vehicle was to remove the windshield, a task requiring a good deal of time, tools, and assistance from others.  *See Chambers*, 399 U.S. at 52, 90 S. Ct. at 1982.  Transporting the car to a DPS location was justified by probable cause and buttressed by safety concerns.  Therefore, the trooper did not violate the Fourth Amendment by searching the car.  Since the search was based upon probable cause, it was not unreasonable.

### III.
### RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that both the motion to suppress and the amended motion to suppress filed by defendant RAMON BANUELOS-ROMERO be DENIED.

### IV.

## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 30th day of January 2009.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

### * <u>NOTICE OF RIGHT TO OBJECT</u> *

Any party may object to these proposed findings, conclusions and recommendation. This case is set for docket call on February 9, 2009. Consequently, the time in which to file objections is shortened. In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is **on or before 4:30 p.m., Thursday February 5, 2009.**

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).